SANDLER ASSOCIATES, L.P. and Daniel R. McCarthy and all other similarly situated plaintiffs, Plaintiffs,

v.

BELLSOUTH CORPORATION, Mobile Communications Corporation of America, BLS Acquisition Corp. I, Inc., Xavier W. Nady, John N. Palmer, C. Victor Raiser, II, Thomas G. Barksdale, R. Faser Triplett, M.D. and E. Lee Walker, Defendants.

Civ. A. No. 89–457 LON.

United States District Court,
D. Delaware.

April 12, 1993.

Mark Minuti, of Saul, Ewing, Remick & Saul, Wilmington, DE, David F. Dobbins, of Patterson, Belknap, Webb & Tyler, New York City, for plaintiffs.

Thomas R. Hunt, Jr., and Robert J. Valihura, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Warren R. Stern, and Stephen R. Neuwirth, of Wachtell, Lipton, Rosen & Katz, New York City, for defendants BellSouth Corp. and Mobile Communications Corp. of America.

Jesse P. Finkelstein, of Richards, Layton & Finger, Wilmington, DE, Kevin D. McDonald, and Thomas F. Cullen, Jr., of Jones, Day, Reavis & Pogue, Washington, DC, for defendants Xavier W. Nady, John N. Palmer, C. Victor Raiser, II, Thomas G. Barksdale, R. Faser Triplett, M.D. and E. Lee Walker.

## OPINION

LONGOBARDI, Chief Judge.

This is a securities action in which the question before the Court is whether the Plaintiffs, Sandler Associates, L.P., Daniel R. McCarthy and all other similarly situated plaintiffs ("Plaintiffs" or the "Sandler Plain-tiffs"), are barred by the doctrine of release from prosecuting the instant action by virtue of a class action settlement approved by the Court of Chancery for the State of Delaware.

## I. BACKGROUND

This action and the related action in the Court of Chancery arose out of a merger initiated in February 1988 and completed on April 4, 1989. In that merger the stock of Defendant Mobile Communications Corporation of America ("MCCA") was acquired by a wholly-owned subsidiary of Defendant BellSouth Corporation ("BellSouth")[1] in exchange for BellSouth stock worth approximately $710 million. MCCA's businesses consisted of, among other things, local and regional paging services, mobile telephone services, telephone answering services and cellular radio telephone operations.

The merger agreement provided, *inter alia*, that immediately prior to the merger, MCCA would distribute to its shareholders all of the stock of an MCCA subsidiary owning businesses that BellSouth would not acquire[2] and in the merger, each share of MCCA would be converted into shares of BellSouth stock worth $28.75. The merger agreement was contingent upon a number of conditions including receipt of regulatory and judicial approvals. At a special meeting of shareholders held on August 24, 1988, MCCA shareholders approved the merger agreement. A previously distributed proxy statement summarized the terms of the merger agreement and reprinted the agreement in its entirety.

In February 1989, after the fair market value of MCCA was alleged to have risen dramatically above the acquisition price established by the merger agreement and upon receipt of a letter from the instant Plaintiffs' counsel demanding that the merger agree-

---

1. This wholly-owned subsidiary, BLS Acquisition Corp. I, Inc. ("BLS"), was named as a Defendant in the case *sub judice*. BLS, a Delaware corporation, was formed by BellSouth for the purpose of implementing the merger with MCCA. The corporate existence of BLS ended on April 4, 1989, the date on which the merger between BLS and MCCA was consummated, with MCCA surviving as a wholly-owned subsidiary of Bell-South. *See* BellSouth's Answer to Plaintiffs'

Amended Complaint, Docket Item ("D.I.") 27 at ¶ 12.

2. MCCA's subsidiary was Mobile Telecommunications Technologies Corporation ("Mtel"). While MCCA became a wholly-owned subsidiary of BellSouth as a result of the subsequent merger, Mtel was "spun-off" to MCCA shareholders prior to the merger and retained its corporate existence independent of BellSouth.

ment be terminated, BellSouth commenced an action against MCCA and Mtel in the Court of Chancery for the State of Delaware, seeking a declaratory judgment that the merger agreement was binding and enforceable and that no event that would permit termination had occurred. Several shareholders of MCCA (the "shareholder plaintiffs"), including the Sandler Plaintiffs, then commenced four separate actions in the Court of Chancery. Each shareholder action named the Defendants herein, MCCA, its directors and BellSouth, as defendants. Each action was purportedly brought on behalf of a class consisting of all MCCA shareholders. MCCA and its directors responded by counterclaiming for a declaration that no event had occurred that would permit termination of the merger agreement. The shareholder and declaratory judgment actions were consolidated by the Court of Chancery. The relief sought by the shareholder plaintiffs included, *inter alia*, a preliminary injunction enjoining the defendants from closing the BellSouth/MCCA merger transaction.

The shareholder actions asserted that the alleged increase in the value of MCCA subsequent to the signing of the merger agreement justified MCCA's directors to abandon the merger and seek a superior acquisition offer for the company. They also alleged that the directors were authorized to terminate or rescind the merger under the terms of the merger agreement in spite of terms of the agreement which apparently indicated otherwise.[3] The shareholders contended, however, that the merger agreement expressly permitted MCCA at any time (and thus required the board in the exercise of its good faith judgment as to its fiduciary duties to shareholders of MCCA based upon advice of counsel) to discuss any unsolicited acquisition proposals from third parties, to provide non-public information to such third parties and to enter into an agreement to merge with or be acquired by a third party. Based on these premises, the shareholders argued that the board was obligated to exercise their fiduciary duties to shareholders to abandon the merger.

In light of the merger agreement's express "no shop" provision and narrowly drawn termination clause, MCCA and its directors took the position that the merger agreement could be terminated only if MCCA received an unsolicited acquisition offer and the board then determined on the advice of counsel that it was required by its fiduciary duties to accept that offer. In response, the shareholder plaintiffs argued that if the MCCA directors were in fact not permitted to abandon the agreement, then the MCCA proxy statement soliciting shareholder approval of the merger was misleading because it failed to disclose such an "interpretation."[4] The

---

3. The shareholder plaintiffs relied on the provision of the merger agreement governing "Termination and Abandonment." Specifically, Section 9.01 provided that:

> This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, before or after the approval by the shareholders of [MCCA]:
>
> *   *   *   *   *   *
>
> (f) By the Board of Directors of the Company [MCCA], if it, in the exercise of its good faith judgment, based upon the advice of counsel, determines that its fiduciary duties to the Company's shareholders require that it: (i) not recommend approval of this Agreement by the Company's shareholders, or that it withdraw such recommendation, or (ii) take an action specified in Section 6.01(e)(ii)....

The "Effective Time" was defined as occurring after the closing of the merger, when the Certificate of Merger would be filed with the State of Delaware. Section 6.01(e)(ii) of the agreement referred to an action by MCCA to merge with, liquidate into or otherwise combine with any third party or enter into an agreement to do any of the foregoing. *See* Defendants' Affidavit and Exhibits ("Ex.") in Support of Motion for Summary Judgment, D.I. 42, Ex. A. (Merger Agreement at §§ 9.01, 1.06 and 6.01, respectively).

Under the terms of the merger agreement, however, MCCA also agreed not to solicit or initiate discussions with any third party concerning a merger with MCCA or the acquisition of MCCA stock or assets. *See id.* at § 6.10.

Further, MCCA had agreed not to furnish any non-public information to third parties concerning a merger with MCCA or the acquisition of MCCA stock or assets. *See id.*

4. The Sandler Plaintiffs subsequently amended their complaint in the Court of Chancery to so allege after the Court of Chancery denied the shareholder plaintiffs' application for a preliminary injunction on March 29, 1989. The exact language of the disclosure in the proxy statement regarding the alleged broad "fiduciary out" provision follows:

shareholder plaintiffs further contended that as a result of the false and misleading statements and omissions contained in the proxy statement, the majority of MCCA's shareholders were induced to, and did vote, to approve the merger agreement.

On March 24, 1989, the parties opened settlement negotiations with all of the shareholder plaintiffs participating in the discussions. These negotiations apparently were unsuccessful. Then, on March 29, 1989, the Court of Chancery denied the preliminary relief sought by the shareholder plaintiffs in the consolidated action. Upon consideration of the pleadings, depositions and affidavits together with the briefs and oral arguments of the parties, Chancellor Allen observed that "[t]his case, as refined by the presentation of counsel at oral argument, presents at this stage principally a question of the adequacy of the disclosure made in the joint solicitation of proxies in connection with the MCCA shareholder approval of the Agreement." *In re Mobile Communications Corp. Consol. Litig.*, Consol. Civ. A. No. 10627, slip op. at 2 (Del.Ch. Mar. 29, 1989) (Allen, C.) (*"MCCA Consol. Litig. I "*). As aptly summarized by the Court of Chancery in its later memorandum opinion certifying the class and approving the settlement,

> [t]he court declined to issue ... an injunction, concluding, albeit preliminarily, that the merger agreement did not, in the circumstances, afford to MCCA a right to terminate the agreement and conclud[ed] also that the proxy materials accurately disclosed the narrow and technical matter that had come to plaintiffs to appear critically important.

*In re Mobile Communications Corp. Consol. Litig.*, Civ. A. Nos. 10627, 10638, 10644, 10656 and 10697, slip op. at 2, 1991 WL 1392 (Del.Ch. Jan. 7, 1991) (Allen, C.) (*"MCCA Consol. Litig. II "*) (citing *MCCA Consol. Litig. I* ), aff'd *without op.*, 608 A.2d 729 (Del.),

*cert. denied*, —— U.S. ——, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992).

In denying the injunction, the Chancellor held that, by reprinting and accurately summarizing the terms of the agreement, the proxy statement had fully and fairly disclosed those terms. The Chancellor found that, among other things, "none of the disclosures made to shareholders reflect[ed] an inaccurate statement concerning the scope or meaning" of the termination provision of the agreement; no relevant fact or conclusion had been omitted from the proxy statement; and the proxy statement could not be said to have contributed to a mistaken interpretation that the agreement granted the MCCA directors "a broad 'fiduciary out.' " *MCCA Consol. Litig. I*, slip op. at 2–6.

On March 30, settlement negotiations recommenced. This time, however, neither the Sandler Plaintiffs nor other plaintiffs represented by the same counsel chose to participate. An agreement in principle to settle the consolidated action was reached on April 1, 1989. The settlement agreement, conditioned upon Court of Chancery approval pursuant to Delaware Chancery Rule ("Chancery Rule") 23(e), provided that, in consideration of a release from any liability to the class, the defendants would increase the value to the individual MCCA shareholders by (1) increasing the number of BellSouth shares to be received by each MCCA shareholder in the merger, (2) timing the merger so that the MCCA shareholders would receive the cash dividend declared by BellSouth for the first quarter of 1989 and (3) increasing the capital of Mtel, which was to be "spun-off" and whose stock was to be distributed to the MCCA shareholders immediately prior to the merger. The Court of Chancery found that the value of these benefits approximated $35 million.

---

*Termination of the Merger Agreement*
The Merger Agreement may be terminated and the Merger abandoned at any time prior to the Effective Time, whether before or after the approval by the stockholders of MCCA: ... by MCCA if its Board of Directors, in the exercise of its good faith judgment, based upon the advice of counsel as to its fiduciary duties to the MCCA stockholders, determines to (i) with-

draw its recommendation that the MCCA stockholders approve the Merger Agreement or (ii) merge with, liquidate into or otherwise combine with any third party or enter into an agreement to do any of the foregoing; *provided* that, in either event, BellSouth shall have received $25 million in cash as a termination fee prior to such termination.
D.I. 42, Ex. A (Proxy Statement).

The Sandler Plaintiffs, together with the other plaintiffs represented by the same counsel, refused to agree to the settlement or to participate in the final round of settlement discussions. They instead applied for leave to appeal to the Supreme Court of Delaware from the denial of the preliminary injunction motion and for an injunction staying the merger pending that appeal. In denying the application and refusing to certify an interlocutory appeal, Chancellor Allen candidly proffered an evaluation of the strengths of the central claims asserted in the consolidated shareholder action, stating that:

"Frankly, I found that the case presented last week was one of the weakest cases legally for the issuance of a preliminary injunction that I have ever encountered in the court.

\*　　\*　　\*　　\*　　\*　　\*

Well, with respect to that aspect of the claim, the probability of success, I have already been as candid as I can be, and more candid than the plaintiffs would care for me to be in telling you that I don't think there is much to this case legally once you get past the practical fact that the plaintiffs may feel that there is more money out there if somebody would just be free to go and look for it."

*MCCA Consol. Litig. II,* slip op. at 3 (citing Transcript of April 3, 1989 hearing). On April 4, 1989, the Delaware Supreme Court denied the application for an interlocutory appeal. BellSouth having obtained the necessary regulatory approvals in the interim, the merger was accomplished the same day with MCCA "spinning-off" Mtel and completing the distribution of Mtel shares to its shareholders and then merging with a subsidiary of BellSouth.

On June 6, 1989, a stipulation of settlement was executed by MCCA, BellSouth and the settling shareholder plaintiffs. At that time, the settling parties moved for an order under Chancery Rule 23(e) approving the settlement on behalf of a class certified under Chancery Rules 23(b)(1) and 23(b)(2) (which are materially equivalent to Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2)), and directing that notice of a hearing on the settlement be provided to the proposed class.

Included in the class were all persons who held Class A or Class B common stock of MCCA as of July 20, 1988 and their successors in interest or transferees, other than the defendants. The Sandler Plaintiffs demanded that the settlement be summarily rejected and that they and the other plaintiffs represented by their counsel be appointed class representatives. On August 14, 1989, the Court of Chancery rejected these demands, scheduled a hearing on the settlement and directed that notice be given to the class. The Chancellor granted to the Sandler Plaintiffs the right to conduct discovery concerning the settlement and to include a statement of reasons for their objections to the settlement in the hearing notice. *See* D.I. 42, Ex. N. Nine days later, the Sandler Plaintiffs commenced the instant action in federal court.

The class on whose behalf the Sandler Plaintiffs purport to bring this federal action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) consists of all persons who held the common stock of MCCA prior to April 4, 1989, the effective date of the Bell-South/MCCA merger, other than the Defendants. Plaintiff Sandler Associates, L.P. is an investment limited partnership which was the holder of in excess of 718,500 Class A and Class B shares of MCCA common stock during the purported class period. These shares represented over three percent of the outstanding shares of MCCA. Plaintiff Daniel R. McCarthy was the holder of in excess of 11,000 Class A and Class B shares of common stock of MCCA. To date, the Court has not entered a class certification pursuant to Federal Rule of Civil Procedure 23(c)(1), pending the resolution of the Defendants' motion for summary judgment.

In the instant action, the Sandler Plaintiffs allege that the Defendants procured MCCA shareholder approval of the merger on the basis of a false and misleading proxy statement which led the shareholders to believe that MCCA had broad rights at any time prior to or after the shareholder approval to terminate the merger agreement in the best interests of the MCCA shareholders. Plaintiffs allege that in denying the MCCA shareholders the value of their company, the De-

fendants violated the federal securities laws, breached their fiduciary duties at common law and committed common law fraud.[5]

Essentially, the complaint repeated the allegations about the MCCA proxy statement that had previously been made in the Court of Chancery, but framed the allegations as purported violations of the federal securities laws. The complaint also repeated the allegations that the MCCA directors had breached their fiduciary duties in completing the merger and in agreeing to settle the shareholder litigation. Moreover, the complaint framed RICO fraud and conspiracy allegations based on the same claims and sought treble damages.[6]

While seeking to move litigation of their claims to federal court, the Sandler Plaintiffs continued to pursue their claims in the related proceedings in the Court of Chancery, including vigorous discovery related to the proposed settlement. Pursuant to an order of the Chancery Court dated December 5, 1989, notice of the proposed settlement was sent to all class members. D.I. 42, Ex. P. The notice included a statement on behalf of the objecting plaintiffs, including Plaintiffs herein, explaining their opposition to the proposed settlement as inadequate. The San-

dler Plaintiffs submitted briefs and presented oral argument at the settlement hearing on January 18, 1990. In opposing the settlement, they conceded that their claims in the instant action were included within the scope of the release under the proposed settlement, and indeed, made that the central premise of their opposition. *See id.*[7]

On January 7, 1991, in *MCCA Consol. Litig. II*, Chancellor Allen ruled that the consolidated shareholder action was properly maintained as a class action under Chancery Rules 23(b)(1) and 23(b)(2) and that the settlement was fair and reasonable to the class (with one modification not here relevant). In evaluating whether to approve the proposed class settlement, Chancellor Allen considered all claims that were or could have been asserted by the class, including claims arising under federal law. He rejected the arguments of the Sandler Plaintiffs that the settlement was not reached in good faith, that due process required that class members be given the right to opt out and that a state court could not approve a release unless the release excluded federal claims.

■ Significantly, Chancellor Allen observed that the approval of the proposed

---

5. Count I of the amended complaint alleges violations of section 10(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Count II alleges violations of section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a). Count III alleges violations of section 11 of the Securities Act, 15 U.S.C. § 77k. Count IV alleges violations of section 12(2) of the Securities Act, 15 U.S.C. § 77l(2). Count V alleges violations of section 15 of the Securities Act, 15 U.S.C. § 77o, and section 20 of the Securities Exchange Act, 15 U.S.C. § 78t. Count VI alleges violations of 18 U.S.C. §§ 1962(a)-(d) (Racketeer Influenced and Corrupt Organizations Act) ("RICO"). Count VII alleges breach of fiduciary duty by MCCA's board of directors. Count VIII alleges common law intentional and negligent misrepresentation. Count IX alleges violations of section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a–5 and 14a–9 promulgated thereunder, 17 C.F.R. §§ 240.14a–5 and 240.14a–9.

6. Specifically, the complaint alleges, among other things: (1) that the MCCA directors breached their fiduciary duties in consummating the merger and authorizing MCCA to agree to the settle-

ment, (2) that the Defendants violated the federal securities laws and the common law by disseminating the proxy statement, which allegedly failed to disclose an alleged "position" of the Defendants with respect to the meaning of the termination provision of the merger agreement (*i.e.*, that under MCCA's interpretation of the merger agreement and under the then current circumstances, there was no provision which would permit MCCA to terminate the merger agreement), and by filing with the Securities and Exchange Commission in November 1988 a registration statement for the securities of Mtel that was allegedly false and misleading in failing to state that MCCA would transfer additional assets to Mtel prior to the "spin-off" and (3) that the Defendants' conduct in connection with the merger violated RICO. The complaint seeks, *inter alia*, compensatory damages of "at least $850,000,000," treble damages under RICO of "at least $2.55 billion" and punitive damages.

7. In fact, in the amended complaint in the case *sub judice*, the Sandler Plaintiffs concede that the settlement was conditioned upon the Delaware Chancery Court's dismissing any and all claims, including those asserted in this case, arising out of or in any way connected with the sale of MCCA to BellSouth. *See* D.I. 26 at ¶ 90.

settlement under Chancery Rule 23(e) operated to release all related class claims currently pending in the instant federal action. In effect, the settled claims included all claims that related in any way to the merger.[8] In the words of Chancellor Allen, "[t]his agreement would release defendants from all claims that might be asserted in connection with the negotiation or effectuation of the merger." *MCCA Consol. Litig. II*, slip op. at 11. The Chancellor further stated that

[a]pproval by this court of the Stipulation of Settlement would entail the dismissal with prejudice of the claims asserted and the release of all other claims arising from the facts alleged. Although the federal court is, of course, free to determine whether the release in question would be given a preclusive effect on the federal claims, *see Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–83 [, 102 S.Ct. 1883, 1897–99, 72 L.Ed.2d 262] (1982), I assume for purposes of this analysis that approval of the Stipulation of Settlement's release of the federal claims would result in dismissal of the federal claims as well. *See Nottingham Partners v. Trans–Lux*

*Corp.*, C.A. No. 88–0591–Z [1990 WL 93513], 1990 U.S. Dist. LEXIS 8078 (D.Mass. June 27, 1990).

*Id.* at 13. This Court agrees that the effect of the settlement and release on the Sandler Plaintiffs' federal litigation is ultimately for this Court to decide. *See, e.g., Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29, 33–34 n. 4 (1st Cir.1991).

On February 6, 1991, Chancellor Allen entered an order and final judgment that (1) certified the shareholder action as a class action under Chancery Rules 23(b)(1) and 23(b)(2), (2) approved the settlement of the action as "fair, reasonable and adequate," (3) dismissed the action "on the merits as to all defendants and with prejudice as against plaintiffs in the Shareholder Actions and all members of the certified class" and (4) directed that the obligations undertaken by the defendants in the settlement "shall be in full settlement, compromise, release and discharge of the Settled Claims, and no Released Party ... shall have any other or further liability or obligations to anyone with

8. The stipulation of settlement contained the following release clause:

... IT IS STIPULATED AND AGREED, by and among the parties to this Stipulation, by their attorneys, subject to the approval of the Court of Chancery, in consideration of the substantial benefits that the members of the Class ... have received and will receive from the Settlement, that *all claims* arising from the beginning of the world up to and including the date of this Stipulation, whether known or unknown, *including but not limited to claims for breach of fiduciary duty and/or fraud, that have been or could have been asserted by any member of the Class ...*, *against any of the defendants*, or any of their respective present or former officers, directors, agents, employees, attorneys, advisers (including Prudential–Bache Securities Inc. and Morgan Stanley & Co. Incorporated), ... (defendants and all such other persons and entities being referred to herein as the "Released Parties") *in connection with* or that may have arisen or hereafter may arise out of or relate in any way to (1) *the Shareholder Actions;* (2) *any discussions or negotiations,* whether or not leading to an agreement, *concerning the possible acquisition of MCCA* or any portion of the assets or stock of MCCA; (3) *the Merger Agreement;* (4) *the Merger;* (5) *the Proxy Statement;* (6) the Special Meeting; (7) the Spin–Off; (8) the Information Statement;

(9) *any statements, representations, actions and/or decisions not to act or failures to act made or taken by MCCA or the members of the Board of Directors of MCCA or BellSouth* or the Board of Directors of BellSouth, either individually or collectively, *in connection with the possible purchase or sale of MCCA* or any portion of the assets or stock of MCCA; (10) *this Settlement* (except for compliance with the Settlement); and/or (11) *any matters, transactions, occurrences or omissions referred to in the complaints in the Shareholder Actions* or the Stipulation (all of which are defined as the "Settled Claims"), shall be compromised, settled, released, discharged and dismissed with prejudice, upon and subject to the following terms and conditions:

\* \* \* \* \* \*

4. The obligations of defendants under this Stipulation shall be in full settlement, compromise, release and discharge of the Settled Claims, and no Released Party shall have any other or further liability or obligations to anyone with respect to the Settled Claims except as expressly provided for herein....

D.I. 42, Ex. R (emphasis added).

The "Class" comprised all holders (other than defendants in the shareholder actions) of MCCA Class A or Class B common stock as of the close of business on July 20, 1988 and their successors in interest or transferees, immediate and remote. *See* D.I. 42, Ex. Q.

respect to the Settled Claims" except for the obligations in settlement. *See* D.I. 42, Ex. Q.

On February 4, 1992, the Supreme Court of Delaware affirmed Chancellor Allen's February 6, 1991 order and final judgment for the reasons set forth by the Court of Chancery in its January 7, 1991 decision. *See* D.I. 42, Ex. S. On June 29, 1992, the Supreme Court of the United States denied a petition by the Plaintiffs for a writ of certiorari. *See* D.I. 42, Ex. T. Shortly thereafter, Defendants filed the instant motion for summary judgment.

Defendants move for summary judgment on three grounds: (1) that the action should be dismissed because the Plaintiffs' claims have been released, (2) that Counts II through VIII of the amended complaint should be dismissed on the ground of *res judicata*[9] and (3) that the amended complaint should be dismissed because it fails to state a claim upon which relief can be granted.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is "genuine" only if a reasonable jury could return a verdict for the nonmoving party. *Id.* Following a determination that no genuine dispute of material facts exists,

the moving party must demonstrate that it is entitled to judgment as a matter of law.

Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly*, 632 F.Supp. 1225, 1231 (D.Del.1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd*, 822 F.2d 388 (3d Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 258 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Regardless of how the Plaintiffs attempt to cast the present dispute, it centers primarily on a matter of law, that is, the Court is called upon to decide as a matter of law whether the release approved by the Court of Chancery for the State of Delaware in the related consolidated state action bars the Sandler Plaintiffs from prosecuting the instant action. Accordingly, if the Court determines that the release operates to preclude this lawsuit, such a conclusion mandates the finding of the absence of any genuine issues of material fact and summary judgment must be granted in favor of the Defendants. In such a situation, the second and third grounds for the motion for summary judgment would be considered moot.

## III. *DISCUSSION*

At the outset, it is clear that the settlement approved by the Court of Chancery for the State of Delaware embraces all of the

---

9. Counts I and IX allege violations of the Securities Exchange Act, that is, claims exclusively within the jurisdiction of the federal courts. *See* 15 U.S.C. § 78aa. On the other hand, Counts II through VIII allege Securities Act and RICO violations, as well as state law claims. State courts have concurrent jurisdiction over Securities Act claims. *See* 15 U.S.C. § 77v(a). Civil RICO claims are subject to the concurrent jurisdiction of the state and federal courts. *See Tafflin v. Levitt*, 493 U.S. 455, 460, 110 S.Ct. 792, 795–96, 107 L.Ed.2d 887 (1990); *McCarter v. Mitcham*, 883 F.2d 196, 200–201 (3d Cir.1989).

claims asserted in this federal action.[10] The Sandler Plaintiffs are members of the certified state court class and each of their claims relates to the merger between BellSouth and MCCA. Specifically, their securities law claims concern the proxy statement and their state law claims for breach of fiduciary duty and common law intentional or negligent misrepresentation concern the merger, the proxy statement and related matters.[11] The issue to be decided, therefore, is the effect of this release on the instant federal litigation.

While the issue presently confronting the Court appears to be a question of first impression in the Third Circuit, the Court of Appeals for the First Circuit has addressed a substantially identical question in a case involving a class action settlement and release approved by the Delaware Court of Chancery in *Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29 (1st Cir.1991). The Court finds the *Nottingham* decision persuasive and is guided by it in resolving the instant motion.

The facts that follow were gathered from the First Circuit's opinion and the district court's decision in *Nottingham Partners v. Trans–Lux Corp.*, Civ. A. No. 88–0591–Z, 1990 WL 93513, 1990 U.S. Dist. LEXIS 8078 (D.Mass. June 27, 1990). In *Nottingham*, the plaintiffs ("Nottingham") brought an action in federal district court alleging violations under section 14 of the Securities Exchange Act, 15 U.S.C. § 78n, and Rule 14a–9 promulgated thereunder, alleging that the defendants, Trans–Lux Corporation ("Trans–Lux") and its directors, failed to disclose important information in a proxy statement. The plaintiffs also brought state common law breach of fiduciary duty and statutory claims arising out of the same transactions and proxy statement. The federal suit sought money damages as well as equitable redress. Precipitating this lawsuit and the state action which followed was Trans–Lux's issuance of a proxy statement soliciting votes on a recapitalization plan and various amendments to its certificate of incorporation.

Approximately two weeks after the federal action was instituted, a Trans–Lux shareholder filed an individual, class and derivative action in Delaware Chancery Court alleging violations of state law related to, *inter alia*, disclosures in the proxy statement. Subsequently, the parties in the state litigation entered into a settlement agreement. After notice of the proposed settlement to all prospective class members, including the plaintiffs in the federal action, the Court of Chancery held a hearing to determine whether to approve the proposed settlement. Nottingham appeared at the hearing and objected vehemently to the proposed settlement. The Chancery Court rejected Nottingham's objections and approved the settlement, including the general release contained therein. The court also certified the state case as a class action under Chancery Rule 23(b)(2) and denied Nottingham the opportunity to opt out of the class.

Upon appeal by Nottingham, the Delaware Supreme Court upheld the Chancery Court decision in all respects. *See Nottingham Partners v. Dana*, 564 A.2d 1089 (Del.1989). The decision of that court was aptly summarized by the First Circuit, as follows:

"The court held in substance that (1) inasmuch as [the state shareholder] action was primarily equitable in nature, class certification was available despite the 'incidental' claim for monetary relief, *id.* at 1094–97; (2) [Nottingham was] lawfully denied egress from the class, *id.* at 1097–1101; (3) the class settlement was, as the vice chancellor had found, fair, reasonable and adequate, *id.* at 1101–04; and (4) because [Nottingham's] federal law claims arose out of the same nucleus of operative fact as the claims prosecuted in [the state shareholder action], the vice chancellor possessed, and appropriately exercised, the power to approve a release that included those claims within its ambit, *id.* at 1105–07. Lack of jurisdictional competency—the fact that a Delaware state court could not have gained subject matter jurisdiction

---

10. For the text of the release, see *supra* note 8.

11. To the extent that the Plaintiffs now seek to assert claims in this action purportedly arising from the agreement to settle the Chancery Court

actions, such claims also fall plainly within the scope of the release approved by the Chancery Court.

over [Nottingham's] federal securities law claims—did not bar the inclusion of those claims within the sweep of the release. *Id.* at 1104–05."

*Nottingham,* 925 F.2d at 31.

After this parade of intervening events, the defendants in the federal action moved for summary judgment on the ground that the claims in that action were released as a result of the settlement in the class action brought in Delaware Chancery Court. The United States District Court for the District of Massachusetts ruled that the defendants were entitled to summary judgment because Nottingham's claims were extinguished at the time the shareholders' class action was resolved in the Delaware courts. *Nottingham,* 925 F.2d at 30. The First Circuit affirmed. *Id.*

Turning to the case *sub judice,* it is well settled that a suit can be barred by the earlier settlement of another suit in either of two ways, *i.e.,* by the separate and distinct defenses of release or *res judicata. See id.* at 31–32 (citations omitted). This proposition is equally applicable to a court-approved class action settlement. *See id.* at 32. If the release defense operates to bar the federal action in its entirety, the Court need not resolve the *res judicata* defense.

As in *Nottingham,* the Delaware Chancery Court explicitly found that the claims asserted here arose out of the same transactions as the claims in the related Delaware consolidated action. This Court identically concludes that the federal action shares a common gravamen with the related Delaware consolidated action and all counts of the Plaintiffs' amended complaint arise out of the same acts and transactions that were at issue in the Court of Chancery actions.

■ In the instant case, as in *Nottingham,* the Delaware Court of Chancery approved a settlement releasing all claims relating to a proxy statement, including federal securities law claims which are within the exclusive jurisdiction of the federal courts. The question that is posed is whether this Court will find the release valid and effective and dismiss the federal claims. When called upon to resolve this question, federal courts have uniformly dismissed claims, including claims committed to their exclusive jurisdiction, that have been released in settlement of class actions brought in state courts. *See, e.g., Nottingham,* 925 F.2d at 33–34; *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 221 (5th Cir.1981); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 720 F.Supp. 1379, 1413 (D.Ariz.1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); *Bernstein v. Mediobanca Banca di Credito Finanziario–Societa Per Azioni,* 78 F.R.D. 1, 2 (S.D.N.Y.1978). *See also Lowenschuss v. Resorts Int'l, Inc.,* Civ. A. No. 89–1071, 1989 WL 73254, at *6 & n. 15, 1989 U.S. Dist. LEXIS 7407, at *20 & n. 15 (E.D.Pa. June 29, 1989) ("this [state court settlement] release, by its plain language, bars suits in federal court, including those based upon claims within the federal court's exclusive jurisdictions"); 18 Charles A. Wright et al., *Federal Practice and Procedure* § 4470 at 688–89 (1981) ("[a]part from claim preclusion as such, settlement of state court litigation has been held to defeat a subsequent federal action if the settlement was intended to apply to claims in exclusive federal jurisdiction as well as other claims"].

Indeed, in *Nottingham,* in affirming the lower court's dismissal of the federal action on the ground of release, the First Circuit observed that "[s]ince the federal securities claims [*i.e.,* Securities Exchange Act claims,] could only be litigated in a federal court, *see* 15 U.S.C. § 78aa, appellants hypothesize that those claims, come what may, could not be barred by a state court settlement. We consider this argument to be jejune." *Nottingham,* 925 F.2d at 33. Based on the weight of authority, this Court concludes that the Chancery Court appropriately exercised its power to approve a release encompassing federal securities law claims under the Securities Exchange Act which were not within the subject matter jurisdiction of the Delaware state courts.

■ In considering the effect of the release on the federal litigation, the Court is

guided by the teachings of *Nottingham, supra.* There, the court explained that

> [t]he release contained in the [state court] settlement, by its terms, met all the criteria necessary to engage the gears of the release defense for purposes of this suit: it (1) applied to appellants, (2) encompassed the claims asserted [in the federal action], and (3) was legally enforceable. . . . [F]urther prosecution of appellants' federal suit is foreclosed by the release defense.

> \*   \*   \*   \*   \*   \*

> Once the class action court, affording the process that is due, determines that an objecting party will not be allowed to opt out of a Rule 23(b)(2) class, the objector becomes subject to a resulting settlement, including any release granted therein, to the same extent as any designated class representative or consenting class member.

*Id.* at 32. The facts of the case *sub judice* fall squarely within *Nottingham's* parameters for a successful release defense by virtue of the class action settlement and release approved and ordered by the Delaware Chancery Court. The claims asserted in this action are encompassed within the state court release and have been released on behalf of a class that indisputably includes the Plaintiffs. Moreover, the release was approved by the Delaware state courts only after notice and full consideration of the Plaintiffs' objections to the settlement and release.

■ The Court additionally is motivated to conclude that the state court-approved release forecloses this federal action based on principles of comity between state and federal courts. To deny effect to a release of claims merely because it was given in an action commenced in state court would invite unprecedented consequences. Such a doctrine would unjustifiably proliferate litigation, defeat legitimate expectations of the settling parties, engender uncertainty among class members and defendants as to their ability to retain the benefits of settlements, discourage settlements altogether and create unwarranted conflict between state and federal courts.

The circumstances of this case make adherence to the settled rules of release particularly appropriate. Here, the Plaintiffs are not only members of the class, but themselves chose to commence the state court class actions in which the release was given and judicially approved. They commenced the federal action only after the Court of Chancery refused to appoint them as class representatives and directed that a hearing be held to consider a settlement proposed by other class action plaintiffs. Even after commencing this action, they chose to continue to litigate their objections to the settlement in the Delaware state courts. The Sandler Plaintiffs were in no sense "absentee" class members.

Indeed, the Plaintiffs were given, and vigorously exercised, a constitutionally adequate opportunity to be heard in the Delaware state courts. *See, e.g., Nottingham,* 925 F.2d at 32. Like the plaintiffs in *Nottingham,* the Sandler Plaintiffs litigated and lost on the issues which they now contest in their opposition to the Defendants' motion for summary judgment: that the consolidated shareholder action was improperly maintained as a class action under Chancery Rules 23(b)(1) and 23(b)(2), that the settlement was woefully inadequate, that the settlement was not reached in good faith, that a state court could not approve a release unless the release excluded federal claims not within the state courts' jurisdiction and that due process required that class members be given the right to opt out. The Plaintiffs thus became collaterally estopped from relitigating these issues and the defense of release is fully applicable to their claims in this action. *See, e.g., Nottingham,* 925 F.2d at 32 (plaintiffs were "collaterally estopped from arguing here, contrary to what the Delaware courts found, that they are outside the terms of the decree or that the settlement was unfair or inadequate").

The Court rejects the Plaintiffs' argument that a question of fact exists as to whether the settlement upon which the release was based is facially collusive or the result of coercion. In an attempt to raise a factual issue about coercion, the Plaintiffs rely entirely on the deposition testimony of the

chairman of MCCA's board of directors concerning, *inter alia*, the settlement. This attempt to inject the specter of a factual dispute regarding the settlement is unavailing, however, because no inference of coercion or collusion is present in that deposition testimony. (The Court need not speculate at this point what effect that would have if such an inference had been found.) The Plaintiffs additionally assert that they were not permitted full and adequate discovery on these issues and thus, the existence of coercion is an issue of fact which must be resolved in their favor on the present motion for summary judgment. To the contrary, the record conclusively demonstrates that the Plaintiffs had ample opportunity to contest the issue of whether the settlement was fair and reached in good faith. Moreover, the record emphatically belies the Plaintiffs' contention that they were prevented from conducting discovery on the issue of coercion. In the Delaware court, the Plaintiffs launched an extensive attack on the conduct of the settling parties as part of their overall attack on the fairness of the settlement. *See, e.g., MCCA Consol. Litig. II,* slip op. at 24–33.[12] *Cf.* 18 Charles A. Wright et al., *Federal Practice and Procedure* § 4470 at 688–89 (1981) ("[s]tate court determinations that the settlements [of state court litigation] were fair, indeed, have been held to preclude relitigation of the fairness issue[;] ... [t]hese rulings are surely correct").

■ The Court likewise rejects the Plaintiffs' argument that it was a denial of due process to prohibit the Plaintiffs from opting out of the certified class and pursuing their exclusive federal damages claims. The Plaintiffs' reliance on *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 810–11, 105 S.Ct. 2965, 2973–74, 86 L.Ed.2d 628 (1985), in support of their argument is misplaced. Unlike the absent class members in *Shutts,* the Sandler Plaintiffs were parties to and actively participated in the consolidated class action in Chancery Court throughout the proceedings and consented to the Chancery Court's jurisdiction by filing their class action suit there. "*Shutts* mandates that a plaintiff be permitted to opt out of a proposed class *when the court does not have personal jurisdiction over the plaintiff.*" *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992) (citing *Shutts,* 472 U.S. at 811–12, 105 S.Ct. at 2974–75) (emphasis added), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Thus, the narrow holding of *Shutts* has no direct application with respect to these Plaintiffs.

Essentially, the Plaintiffs press the opt out argument in an attempt to have this Court review the propriety of the class certification and their inclusion in the class. As with their other arguments, Plaintiffs again cannot prevail. "[A] court-approved settlement containing a release may be applied against a class member who is not a representative member, even if that member objects to the settlement, so long as acceptable procedural safeguards have been employed." *Nottingham,* 925 F.2d at 33 (citations omitted). Like *Nottingham,* here, "[t]he Delaware courts, affording all the prophylaxis which the Due Process Clause commands, adjudicated the question of whether [the Sandler Plaintiffs] had a right, or should have been allowed, to opt out of the settlement." *Id.* In objecting to the class certification and settlement, the Plaintiffs were given, and vigorously exercised, a constitutionally adequate opportunity to be heard on this issue.

## IV. CONCLUSION

For the reasons stated herein, the Court grants the Defendants' motion for summary

---

**12.** The Plaintiffs' own reliance on their December 20, 1989 deposition of MCCA's former CEO and board chairman, John N. Palmer ("Palmer"), to establish the inference of coercion belies their purported lack of discovery on the coercion issue. This deposition represented the second time that Palmer was deposed by the Plaintiffs in the state court action. Plaintiffs themselves supplied the deposition transcript in opposing the Defendants' instant motion for summary judgment. *See* D.I. 48, Ex. HH. Throughout the deposition, Plaintiffs' counsel repeatedly asked Defendant Palmer about pressures brought to bear by BellSouth on MCCA to close the merger deal and settle with the shareholder plaintiffs in the state court action. The Court finds, however, that nothing contained therein raises a genuine issue of material fact as to whether MCCA was "coerced" into settling the shareholder actions. The record is simply devoid of inferences of coercion.

judgment because the action is barred by a settlement and release approved by the Court of Chancery for the State of Delaware in the related consolidated class action.